AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

APR 2 5 2018

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Disclosure of Location-Based Services for Sprint Cellular
Telephone Number (850) 321-4021

)
)
)
)
)
)

Case No.  1:18-sw-236

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
Facilities belonging to service provider Sprint associated with cellular telephone number (850) 321-4021.  This Court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(a) and Fed. Rule of Crim. P. 41.

located in the _____ District of _____ Kansas _____ , there is now concealed *(identify the person or describe the property to be seized)*:
Disclosure of location-based electronic communications data for Sprint cellular telephone number (850) 321-4021

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | Conspiracy to distribute heroin |

The application is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Donald August Mockenhaupt, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  4/25/18

City and state:  Alexandria, Virginia

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

Hon. Theresa Carroll Buchanan, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to Be Searched*

1.      The cellular telephone assigned call number **(850) 321-4021** (the "Subject Cell Phone"), whose wireless service provider is Sprint, a wireless telephone service provider headquartered at 6200 Sprint Parkway, Overland Park, Kansas 66251.

2.      Information about the location of the Subject Cell Phone that is within the possession, custody or control of Sprint.

## ATTACHMENT B

### *Particular Things to be Seized*

All information about the location of the Subject Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Subject Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Subject Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

APR 2 5 2018

| | | |
|---|---|---|
| IN THE MATTER OF THE APPLICATION | ) | |
| OF THE UNITED STATES OF AMERICA | ) | |
| FOR A SEARCH WARRANT AND ORDERS | ) | (Under Seal) |
| PURSUANT TO 18 U.S.C. §§ 2703(c)(1)(A) | ) | |
| AND 3122(a)(1) FOR THE 1) DISCLOSURE | ) | 1:18-ec- 674 |
| OF LOCATION BASED SERVICES, | ) | 1:18-sw- 236 |
| 2) DISCLOSURE OF STORED | ) | |
| TELECOMMUNICATIONS RECORDS FOR | ) | |
| TELEPHONE NUMBER **(850) 321-4021** | ) | |
| AND 3) INSTALLATION OF A PEN | ) | |
| REGISTER AND TRAP AND TRACE DEVICE | ) | |

AFFIDAVIT IN SUPPORT OF
A SEARCH WARRANT AND ORDER UNDER 18 U.S.C. § 2703(c)(1)(A)
AND AN ORDER UNDER 18 U.S.C. § 3122(a)(1)

I, Donald August Mockenhaupt, being duly sworn, depose and state as follows:

INTRODUCTION

1.      I am a duly appointed Special Agent of the Federal Bureau of Investigation (FBI)

and have been employed as such since February 2002. I am currently assigned to a squad that

investigates violent gangs and criminal enterprises out of the Washington (D.C.) Field Office,

Northern Virginia Resident Agency, and I have been assigned to this squad since August 2004.

2.      As an FBI Special Agent, I have received extensive training in the enforcement of

the criminal laws of the United States, as well as extensive training in criminal investigations. I

have also participated in numerous investigations involving unlawful narcotics distribution. In

these investigations, I have been involved in the application for and execution of many arrest and

search warrants for narcotics related offenses, resulting in the prosecution and conviction of

numerous individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other

evidence of criminal activity. As a narcotics investigator, I have interviewed many individuals

involved in drug trafficking and have obtained information from them regarding the acquisition,

sale, importation, manufacture, and distribution of controlled substances. Through my training

and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized

by the traffickers and users of controlled dangerous substances.

4.      This affidavit is submitted in support of an application for a search warrant, an

order for the disclosure of location-based services and stored telecommunications records, and an

order for the installation of a pen register and trap and trace device for the cellular telephone

number **(850) 321-4021**, serviced by Sprint (defined in the Application and herein as "SUBJECT

TELEPHONE NUMBER"), pursuant to Federal Rule of Criminal Procedure 41(d)(1) and Title

18, United States Code, Sections 2703(c) and 3122(a). The SUBJECT TELEHONE NUMBER

is suspected to be used by Sheldon Michael BROWN (BROWN), and for the reasons described

herein, there is probable cause to believe that the SUBJECT TELEPHONE NUMBER is being

used by BROWN in connection with and to further a conspiracy to distribute a mixture and

substance containing heroin, a Schedule I controlled substance, in violation of Title 21, United

States Code, Sections 841(a)(1) and 846. The facts further demonstrate sufficient grounds to

believe the disclosure of location-based services and the disclosure of stored telecommunications

records, as well as the installation of a pen register and trap and trace device on the SUBJECT

TELEPHONE NUMBER, will be relevant and material to an ongoing criminal investigation.

5.      This affidavit does not contain every fact known to me regarding this

investigation, but rather contains information necessary to demonstrate probable cause in support

of the above-referenced search warrant and orders. The facts and information contained in this

2

affidavit are based on information from a confidential source, controlled drug purchases, physical surveillance, my personal knowledge, telephone records, and information obtained from other law enforcement officers. All observations referenced in this affidavit that were not personally made by me were relayed to me by the person(s) who made such observations or in reports that detailed the events described by that person(s).

PROBABLE CAUSE

A.     Background of Investigation

6.      In 2017, the Fairfax County Police Department's (FCPD) Narcotics Unit obtained information from a confidential source (hereafter CS) that Sheldon Michael BROWN distributed heroin in the northern Virginia area. The CS has a misdemeanor conviction for marijuana possession and pending state charges for Schedule I or II drug possession and possession of drug paraphernalia. The CS is cooperating with law enforcement in anticipation of having his charges reduced or dismissed and/or having his sentence reduced. Much of the information provided by the CS has been corroborated through physical surveillance, controlled drug purchases and telephone record analysis. I believe that the CS has provided truthful information.

7.      On December 28, 2017, the CS participated in a controlled drug purchase from BROWN as part of an FCPD operation. The CS met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $1,200 in official government funds to BROWN in exchange for approximately 10 grams of suspected heroin. The substance is pending analysis at the Commonwealth of Virginia Department of Forensic Science.

3

8.      In January 2018, a joint FBI-FCPD investigation was initiated. On January 19, 2018, the CS called BROWN in a recorded telephone conversation and asked to purchase 10 grams of heroin from him later in the day. The CS then met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $1,200 in official government funds to BROWN in exchange for approximately 10 grams of suspected heroin. The transaction was audio recorded. The suspected heroin was subsequently analyzed by the DEA Laboratory and was found to contain heroin with a net weight of 9.94 grams and the purity was 87% (+/- 4%).

9.      On February 1, 2018, the CS called BROWN in a recorded telephone conversation and asked to purchase 20 grams of heroin from him later in the day. The CS then met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $2,400 in official government funds to BROWN in exchange for approximately 20 grams of suspected heroin. The transaction was audio and video recorded. The suspected heroin was not field tested due to Agent safety. The substance is pending analysis at the DEA Laboratory.

10.      On February 21, 2018, the CS called BROWN in a recorded telephone conversation and asked to purchase 20 grams of heroin from him on the following day. On February 22, 2018, the CS met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $2,400 in official government funds to BROWN in exchange for approximately 20 grams of suspected heroin. The transaction was audio and video recorded. The suspected heroin was not field tested due to Agent safety. The substance is pending analysis at the DEA

4

Laboratory.

11.     On March 6, 2018, the CS called BROWN in a recorded telephone conversation and asked to purchase 40 grams of heroin from him on the following day. On March 7, 2018, the CS called BROWN in a recorded conversation and modified the requested amount to 20 grams. Later on March 7, 2018, the CS then met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $2,400 in official government funds to BROWN in exchange for approximately 20 grams of suspected heroin. The transaction was not recorded due to technical issues, but investigators monitored the transaction via a transmitter. The suspected heroin was not field tested due to Agent safety. The substance is pending analysis at the DEA Laboratory.

12.     During the March 6, 2018, meeting, BROWN told the CS that he had approximately 38 to 40 grams of heroin remaining and available to sell. BROWN then told the CS that he would be travelling to Atlanta in the near future in order to obtain additional heroin. BROWN explained that the drive would take approximately eight hours, and that he would not immediately turn around after obtaining the heroin.

13.     On March 21, 2018, the CS called BROWN in a recorded telephone conversation, and BROWN stated that he had 42 grams of heroin available for sale.   On March 22, 2018, the CS called BROWN's telephone in a recorded conversation and asked to purchase 10 grams from BROWN later in the day. Later on March 22, 2018, the CS met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $1,200 in official government funds to

5

BROWN in exchange for approximately 10 grams of suspected heroin. The transaction was audio recorded. The suspected heroin was not field tested due to Agent safety. The substance is pending analysis at the DEA Laboratory.

14.     I reviewed the recordings from the transaction that occurred on March 22, 2018. During the meeting, BROWN mentioned to the CS that he had to go to Best Buy. Shortly thereafter, at approximately 5:46 pm, a mobile telephone rang in the background of the recording and BROWN could be heard saying, "Hello." The CS exited BROWN's car at this point and departed from the deal location.

15.     Surveillance units followed BROWN from the deal location with the CS to a Best Buy store in Fairfax County, within the Eastern District of Virginia. Agents observed an individual ("Individual A") exit a vehicle parked in the Best Buy parking lot and enter BROWN's vehicle. Individual A exited BROWN's shortly thereafter. I reviewed the Virginia Department of Motor Vehicles records for the registered owner of the vehicle and compared the driver's license photo to a surveillance photo of Individual A. Based on the comparison, Individual A appears to be the registered owner of that vehicle.

16.     On April 19, 2018, the CS called BROWN's telephone in a recorded conversation and asked to purchase 20 grams of heroin from BROWN later in the day. Later on April 19, 2018, the CS met BROWN in a parking lot in Annandale, Virginia, within the Eastern District of Virginia. BROWN traveled to the deal location in a vehicle registered to him. The CS provided $2,400 in official government funds to BROWN in exchange for approximately 20 grams of suspected heroin. The transaction was audio recorded. The suspected heroin was not field tested due to Agent safety. The substance will be transported to the DEA Laboratory for analysis.

6

17.    The seven aforementioned controlled drug purchases all occurred in the same manner.  Specifically, the CS met BROWN in a parking lot and entered BROWN's car in order to conduct the transaction.  Based on this information and on my training and experience as a narcotics investigator, I believe that Individual A likely obtained narcotics from BROWN during the interaction in the Best Buy parking lot.  I also know that telephonic contact between a drug seller and buyer often occurs shortly before a transaction as they often need to coordinate the logistics for the transaction.

18.    I reviewed telephone records for (703) 863-6855, the telephone number that the CS has used to communicate with BROWN, from August 1, 2017, through the present and observed a significant decline in call activity throughout the months.  In the past three months, telephone number (703) 863-6855 has had contact with a very small number of telephone numbers besides the CS's telephone number.  In my experience as a narcotics investigator, this lack of activity is unusual for a person involved in drug distribution.  The telephone record analysis for (703) 863-6855 showed that BROWN had been contacted by a telephone number subscribed to Individual A.  However, there was no contact between (703) 863-6855 and Individual A's number at approximately 5:46 pm on March 22, 2018, when BROWN's telephone rang.  Therefore, I obtained telephone records for the telephone number used by Individual A.  I observed that the SUBJECT TELEPHONE NUMBER received an incoming telephone call from Individual A at 5:45 pm, which I believe was Individual A calling BROWN for final coordination prior to their meeting at the Best Buy.  I then obtained telephone records from Sprint for the SUBJECT TELEPHONE NUMBER.

19.    I reviewed the records for the SUBJECT TELEPHONE NUMBER for the time

7

period of February 1, 2018 through April 8, 2018. Based on this review, I believe that BROWN

is the actual user of the SUBJECT TELEPHONE NUMBER despite it being subscribed to "Jon

Stanley." I believe this for several reasons. First, it had contact at 5:45 pm on March 22, 2018,

with a phone registered to Individual A, who was observed conducting a suspected drug

transaction with BROWN at the Best Buy shortly thereafter. Second, it has a Florida based area

code. BROWN told the CS in a recorded conversation that he previously attended college in

Florida. Finally, there are three telephone numbers that are common contacts between the

SUBJECT TELEPHONE NUMBER and (703) 863-6855, which BROWN uses to coordinate

heroin transactions with CS.

     20.    Based on my training and experience as a narcotics investigator, I know that it is

common for those involved in drug trafficking to utilize multiple mobile telephones. Based on

telephone records analysis, I believe that BROWN is currently using at least three mobile

telephones, specifically (202) 378-3507, (703) 863-6855 and the SUBJECT TELEPHONE

NUMBER. Based on a review of call activity of the SUBJECT TELEPHONE NUMBER, I

believe that BROWN uses the device on a daily basis and most likely carries the device with him

on a consistent basis.

B.    Use of Phones by Drug Traffickers to Further Their Criminal Activity

     21.    Based on my training, experience, and participation in narcotics and drug-related

investigations, and the training and experience of other agents with whom I am working on this

investigation, I know that:

       a.   It is common for individuals engaged in the distribution of controlled substances to

           utilize telephonic communications, both cellular and hard line, to further their

criminal activities by coordinating the distribution of narcotics, illegal proceeds of

narcotics trafficking, and other efforts of co-conspirators;

b. Individuals engaging in the distribution of controlled substances utilize cellular

telephones and cellular telephone technology to communicate and remain in

constant contact with customers and the sources of those controlled substances; and

c. Individuals who engage in the distribution of controlled substances utilize cellular

telephones to exchange information with customers and/or source(s) of supply

through text-messaging and instant messaging in addition to direct telephone

conversations.

C.    Use of Location-Based Services as an Investigative Tool

22.    Cell sites only disclose the location of an Antenna Tower. Like plugging a

conventional phone into a "wall-jack," wireless telecommunications providers quickly and

accurately detect which one of their "wall-jack" cell-sites is accessed by a mobile phone; and,

equipped with knowledge of that cell-site's physical tower location, agents can inferentially

approximate the SUBJECT TELEPHONE NUMBER's location, at best to within several square

miles, at call beginning and end. This approximated location can be used to corroborate the

observations of surveillance agents and to anticipate future movements and locations by

establishing the target's habit or pattern. For example, if a target's first and last wireless calls of

the day occur in the same cell site, the geographic footprint of the area covered by that cell site

should correspond to the general location where the target is residing, working or sleeping. If there

are several known addresses—as identified through subscriber records derived from the pen/trap

or otherwise—in that same cell site's coverage area, then there is a strong possibility that the target is residing with or visiting one of those individuals.

23. While the information acquired by cell-site analysis (which is created and stored in the ordinary course of business each and every time the mobile phone makes or receives a call) can be coarse and non-specific, information obtained from the telecommunications providers using their "Enhanced 911" (or "E-911") tools (such as GPS fixes, triangulation, cell-site "pings," received signal strength indicator (RSSI), and timing offset analysis) can be much more precise. More precise information allows investigators to get closer to the actual handset. Some of these E-911 tools are not records that exist in the ordinary course of business and often are not created unless the user of the phone dials "911." Thus, unless a provider has reason to believe a mobile phone's user is in distress (typically by virtue of a 911 call), telecommunications providers will require a court order to create, record, and disclose these electronic records to law enforcement. I submit that there is probable cause to support a court order to require the creation of these records and to compel the disclosure of these records. These records, however, are rarely so precise as to establish the phone's presence in a particular house or apartment and cannot be relied upon as a sole basis for attempting warrant service at any particular location.

24. Whether the FBI receives real-time cell sites or requests the provider disclose E-911 location information, no government "device" is involved. Rather, cell-site records are passed contemporaneously with pen register and trap and trace data from the accessing cell site to the local Mobile Telephone Switching, which forwards the information to the Provider's central collection facility (i.e. their law enforcement relations/court order bureau offices). From there, the provider authorizes the data stream for release to the FBI through its CALEA-compliant network.

25.     Similarly, when the FBI requests E-911 tools in an attempt to locate the physical handset, no government "device" is used. Rather, the provider will query the phone, which must be on, to ascertain its location through a two-way data dialogue. That information is captured and stored by the provider and passed on to the investigative agency orally or in writing (e.g. email or fax).

26.     Based on my training, experience, and knowledge of this investigation, I believe that the installation of a pen register trap and trace device and the disclosure of location-based services and stored telecommunications records will allow law enforcement to monitor the user of the SUBJECT TELEPHONE NUMBER's involvement in illegal activities. Additionally, this order would provide investigating agents the ability to identify other conspirators and effectively track the user of the SUBJECT TELEPHONE NUMBER's movements.

27.     Once I receive an order for the type of information requested herein, it is served upon the SUBJECT TELEPHONE NUMBER's provider. Once received, it is catalogued and assigned to an electronic surveillance representative, who, based on caseload, will "provision" the SUBJECT TELEPHONE NUMBER for delivery in the appropriate "switches," thereby instructing those switches to forward the information to the Provider's central collection point. "Provisioning" can occur at any time and, except for exigent cases, is dictated solely by the Provider. Thus, the FBI cannot control whether the Order will be electronically implemented during day or night.

CONCLUSION

28.     Based on the facts and circumstances stated above, I submit that there is probable cause to believe that the above-described drug violations have occurred, are presently occurring,

11

and will continue to occur; and that the SUBJECT TELEPHONE NUMBER is being used in furtherance of illicit drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846. I believe that the installation of a pen register trap and trace device and the disclosure of location-based services and stored telecommunications records will allow law enforcement to effectively track the movements of the user of the SUBJECT TELEPHONE NUMBER and effectively identify other conspirators.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Donald August Mockenhaupt
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 25th day of April, 2018.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

The Honorable Theresa Carroll Buchanan
United States Magistrate Judge
Eastern District of Virginia

12

# ATTACHMENT A

*Property to Be Searched*

1.      The cellular telephone assigned call number **(850) 321-4021** (the "Subject Cell Phone"), whose wireless service provider is Sprint, a wireless telephone service provider headquartered at 6200 Sprint Parkway, Overland Park, Kansas 66251.

2.      Information about the location of the Subject Cell Phone that is within the possession, custody or control of Sprint.

## ATTACHMENT B

*Particular Things to be Seized*

All information about the location of the Subject Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Subject Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of the Subject Cell Phone on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).